**Opinion issued February 7, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00921-CV

———————————

**DAN SILVESTRI, Appellant**

**V.**

**INTERNATIONAL BANK OF COMMERCE, Appellee**

---

**On Appeal from the 125th Judicial District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-21107**

---

## MEMORANDUM OPINION

Appellant, Dan Silvestri, challenges the trial court's rendition of summary judgment in favor of appellee, International Bank of Commerce ("IBC"), in IBC's suit against Silvestri for breach of a guaranty agreement and attorney's fees. In

two issues, Silvestri contends that the trial court erred in granting IBC summary judgment and denying him summary judgment.

We reverse and remand.

## Background

In its petition, IBC alleged that Silvestri and Tyler Todd[1] had executed personal guaranty agreements, each promising to pay one-half of the outstanding debt owed to IBC by Rainsong Partners, Ltd. ("Rainsong"), which had defaulted on three promissory notes secured by real estate liens. IBC further alleged that concurrent with the execution of the promissory notes, Silvestri and Todd had signed their guaranty agreements, under which they were each liable for "fifty percent of the outstanding principal amount at the time of demand for payment, accrued and unpaid interest, late charges, [attorney's] fees, collection costs, and all other sums owing by Rainsong to IBC."

In his answer, Silvestri generally denied IBC's allegations and asserted that "the foreclosure sale price of the property securing the indebtedness sought to be recovered was less than the fair market value of such property on the date of the foreclosure sale" and IBC "only is entitled to seek a deficiency judgment equal to the difference between the amount owing on the note" and "the fair market value of the Mortgaged Property." In his counterclaim against IBC, Silvestri also sought

---

[1] Todd died during the pendency of this suit, and the trial court severed the claims against him.

2

attorney's fees from IBC if "successful in reducing and/or eliminating the indebtedness sought to be recovered" by IBC.

In his summary-judgment motion, Silvestri asserted that each of the promissory notes were secured by deeds of trust and IBC foreclosed upon the properties on April 7, 2009, purchasing the properties at the foreclosure sales. He attached to his motion each of the deeds of trusts, which contained identical addendums that define the "Mortgaged Property" for each note to include:

> [T]he escrowed sums described herein, if any, all goods, equipment, fixtures, inventory, machinery, furniture, furnishing, and other personal property that is now owned or hereafter acquired by Grantors and now or hereafter affixed to, or located on, the above described real estate . . . .

The addendums to the deeds of trust further provide:

> 4. Fair Market Value for Calculating Deficiencies. Notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantors agree that Beneficiary shall be entitled to seek a deficiency judgment from Grantors and any other party obligated on the Note or guaranty of the Note equal to the difference between the amount owing on the Note and fair market value of the Mortgaged Property as hereinafter determined.

Silvestri asserted that the addendum unambiguously provides that IBC is entitled to recover a deficiency judgment from Silvestri only if IBC proved the fair market value of the mortgaged property, IBC presented no competent evidence of the fair market value, and Silvestri was entitled to recover attorney's fees from IBC.

3

In its amended summary-judgment motion, IBC asserted that the express terms of the guaranty agreements, without reference to the deeds of trust, entitled it to judgment as a matter of law. And it noted that on April 2, 2009, it made to Silvestri its final demand of repayment before foreclosing on the properties on April 7, 2009. IBC attached to its motion the real estate lien notes and guaranty agreement, which contained an addendum that provides,

> Anything in the Guaranty to the contrary notwithstanding, the term "Guaranteed Indebtedness," with respect to principal only, shall mean fifty percent (50%) of the outstanding principal amount at the time of demand by Lender on Guarantor for payment on the Guaranty of all of Borrower's obligations to Lender (the "Obligations"), without giving effect to any prior or contemporaneous payment by any other guarantor(s). Accordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty, the amount of the Obligations shall not be reduced by any payment or payments made by any other guarantor(s) on any of the obligations. The term Guaranteed Indebtedness shall also include fifty percent (50%) of all accrued and unpaid interest, late charges, attorneys' fees, all costs incurred by Lender in connection with the Borrower to Lender arising in connection with the Obligations . . . .

IBC asserted that, at the time of demand, there was $858,251.80 owing on the first note, $2,285,185.44 owing on the second note, $924,838.62 owing on the third note, and $910,818.82 in accrued interest, expenses, and attorney's fees, for a total balance due of $4,979,094.68. It maintained that it was entitled to recover from Silvestri one-half of this amount, or $2,489,547.34. IBC also attached to its motion its winning bids at the foreclosure sale, which indicated that the three properties were sold to IBC for a combined total of $1,694,000. However, IBC

4

argued that Silvestri was not entitled to a credit for the price paid at the foreclosure sale because, at the time of demand, the foreclosure sale had not taken place.

In its response to Silvestri's summary-judgment motion, IBC asserted that, even if Silvestri was entitled to a credit for the fair market value of the property, the burden of establishing the credit rested with Silvestri. It attached to its response, in "an abundance of caution," an appraisal of the three properties secured by the real estate lien notes as evidence of their fair market value. The appraisal reflected that on February 10, 2009, IBC's appraiser, Phillip Barletta, valued the three properties at $2,420,000. IBC also attached to its response an affidavit from Barletta, in which he testified that the market value would not have "materially changed" from the date of his appraisal to April 7, 2009, the date of the foreclosure sale.

Silvestri attached to his response to IBC's summary-judgment motion, the affidavit of Jack Hughey. Hughey testified that Barletta's appraisal was "incomplete" because it failed "to give any value to the Municipal Utility District ("MUD") receivables, which are part of the 'Mortgaged Property' foreclosed upon by the Bank and which will be payable to the Bank." Based upon a previous appraisal by Barletta made on October 31, 2005, Hughey valued the MUD receivables "in excess of $1,800,000 as of April 7, 2009." Thus, Silvestri argued, the fair market value of the properties "substantially exceeded the indebtedness

5

secured by the Deeds of Trust," and he asserted that the Deeds of Trust put the burden on IBC to prove the fair market value of the properties. Silvestri also attached to his response the affidavit of his attorney, Michael O'Connor, who testified that, in his opinion, the attorney's fees requested by IBC were "grossly unreasonable" because there were "no depositions taken in this case and only limited written discovery," IBC's attorney did "not even state the time spent by the various attorneys on the case," and the requested fees in case of appeal were "unreasonable for any appeal of a summary judgment."

IBC objected to Hughey's affidavit as "irrelevant, inadmissible hearsay, unreliable and conclusory." Specifically, IBC objected to Hughey's reliance on Barletta's 2005 appraisal because it was made four years prior to the foreclosure sale. And it noted that the 2005 appraisal was "subject to a review of the actual costs by the appraiser after completion of the subject proposed property," which was never completed. IBC argued that the 2005 appraisal constituted hearsay because, although an expert may reasonably rely on hearsay in forming an opinion, it was not reasonable for Hughey to rely on an appraisal made four years prior to the foreclosure sale. IBC further argued that because of the "irrelevance and unreliable nature of the information relied upon by Mr. Hughey in his affidavit," his valuation of the MUD receivables at over $1,800,000 was "unsupported and therefore conclusory." IBC also asserted that O'Connor's affidavit challenging its

6

request for attorney's fees was conclusory and "fail[ed] to establish how or why IBC's fees are unreasonable," while the affidavit in support of its attorney's fees "expressly addresses each of the necessary standards."

Silvestri filed a Motion to Supplement Summary Judgment Response, and he attached to it a second affidavit from Hughey "in order to correct technical objections raised by [IBC]." In his second affidavit, Hughey testified that he had exchanged emails with Rick Alejo and Alan Hirshman, engineers for the MUD of which the properties in question where a part. Alejo and Hirshman explained that a pending Municipal Bond sale would result in a payment to the bank of $941,130 and $2,034,273 of receivables remained to be reimbursed from future bond sales. IBC objected to Silvestri's motion, arguing that it was untimely because "all evidence being used to oppose a summary judgment must be on file at least seven days before the summary judgment hearing" and the supplemental evidence was submitted after that deadline. The trial court denied IBC's objections and permitted Silvestri to supplement his summary-judgment evidence with the second Hughey affidavit.

The trial court denied Silvestri's summary-judgment motion, granted IBC's summary-judgment motion, and entered a final judgment that IBC recover $2,626,527.66 in actual damages from Silvestri and $10,000 in post-judgment attorney's fees. The trial court also awarded IBC attorney's fees in the amount of

$15,000 "for any motion for new trial that is filed," $50,000 "for an appeal to the Court of Appeals if any such appeal is filed," $50,000 "if a Petition for Review is filed with the Supreme court," and $50,000 "if the Petition for Review is granted."

**Standard of Review**

We review a trial court's decision to grant or to deny a motion for summary judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192, 199 (Tex. 2007) (citing rule for review of grant of summary judgment and reviewing denied cross-motion for summary judgment under same standard). Although a denial of summary judgment is not normally reviewable, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other. *Id.* at 192. When the trial court's ruling granting one summary-judgment motion necessarily denies another pending summary-judgment motion on the same issue, such as here, we imply the ruling of denial. *See Frank's Int'l, Inc. v. Smith Int'l, Inc.*, 249 S.W.3d 557, 559 n.2 (Tex. App.—Houston [1st Dist.] 2008, no pet.). In our review of such cross-motions, we review the summary-judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *Tex. Mun. Power Agency*, 253 S.W.3d at 192 (citing *Comm'r Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)). If we determine that a fact issue precludes summary judgment for either party, we remand the cause for

8

trial.  *See Univ. of Tex. Health Sci. Ctr. at Houston v. Big Train Carpet of El Campo, Inc.*, 739 S.W.2d 792, 792 (Tex.1987) (per curiam).

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact.  TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995).  When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law.  *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).  When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.  *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985).  Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor.  *Id.* at 549.

**Breach of Guaranty Agreement**

In his first issue, Silvestri argues that the trial court erred in denying him summary judgment and granting IBC summary judgment because it allowed "only the foreclosure bid prices as a credit on the indebtedness" even though the addendums to the deeds of trust "specifically provided that the Bank shall be

9

entitled to seek a deficiency against a guarantor only in an amount equal to the difference between the indebtedness and the fair market value of both the real estate and intangible property collateral." Silvestri asserts that "the fair market value of the collateral would completely eliminate any deficiency claim against" him. IBC asserts that the plain language of the guaranty agreement describes the guaranteed indebtedness as the outstanding principal amount at the time of demand, which does not take into account the fair market value of the property.

### *Construction of the Guaranty*

Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Usually, the intent of the parties can be discerned from the instrument itself. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When an issue regarding the construction of a contract is presented, we must examine and consider the entire writing in an effort to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345. Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Dorsett*, 164 S.W.3d at 662. When the

10

parties have entered into an unambiguous contract, the courts will enforce the intention of the parties as written in the instrument. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981).

A guarantor's liability is measured by the principal's liability unless a more extensive or more limited liability is expressly provided for in the guaranty. *W. Bank–Downtown v. Carline*, 757 S.W.2d 111, 113 (Tex. App.—Houston [1st Dist.] 1988, writ denied). To determine the extent of the guarantor's liability, we look to the language of the guaranty agreement. *Id.* If the guaranty agreement is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and we construe the contract as a matter of law. *Id.* at 114. If uncertainty exists as to the meaning of the guaranty contract, and if two reasonable interpretations may be made, we apply the construction most favorable to the guarantor. *Coker v. Coker*, 650 S.W.2d 391, 394 & n.1 (Tex. 1983) (explaining that "guarantor is entitled to have his agreement strictly construed so that it is limited to his undertakings, and it will not be extended by construction or implication"); *Clarke v. Walker–Kurth Lumber Co.*, 689 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

IBC largely relies on the following provision, found in the addendum to the Silvestri guaranty, for the proposition that Silvestri was not entitled to a credit for the fair market value of the properties,

11

Anything in the Guaranty to the contrary notwithstanding, "Guaranteed Indebtedness," with respect to principal only, shall mean fifty percent (50%) of the outstanding principal amount at the time of the demand by Lender on Guarantor for payment on the Guaranty of all Borrower's obligations to Lender (the "Obligations"), without giving effect to any prior or contemporaneous payment by any other guarantor(s). Accordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty, the amount of the Obligations shall not be reduced by any payment or payments made by any other guarantor(s) on any of the Obligations. The term Guaranteed Indebtedness shall also include fifty percent (50%) of all accrued and unpaid interest, late charges, attorneys' fees, all costs incurred by Lender in connection with the collection of the Obligations and the enforcement of the Guaranty, and all other sums owing by Borrower to Lender in connection with the Obligations, and all documents securing payment thereof and executed in connection therewith . . . .

IBC argues that because the addendum provides that "Guaranteed Indebtedness . . . shall mean fifty percent (50%) of the outstanding principal amount at the time of demand," it provides a "method for ascertaining the guaranty liability" and constitutes a "formulaic guaranty." The same addendum later provides that "[c]apitalized terms used in this Addendum shall have the same meaning as ascribed to such terms in the Guaranty unless defined otherwise herein."

IBC argues that the Deeds of Trust and their Addendums are not relevant to Silvestri's liability because Silvestri is not a party to them. However, the Silvestri guaranty defines "Guaranteed Indebtedness" as "all liabilities and obligations of Borrower . . . to Lender," including, but not limited to, "any indebtedness, however evidenced, whether by promissory note, bookkeeping entry, electronic transfer,

12

checks, drafts or other items, or by any other manner or form." It specifically guarantees "the performance and discharge of the obligations of Borrower specified under any and all promissory notes, letters of credit, and all other documents and instruments (the "Security Instruments") executed by Borrower and/or other parties in connection with the Guaranteed Indebtedness." Thus, the Silvestri guaranty itself references the documents comprising the underlying transaction in describing Silvestri's obligations.

Furthermore, the language and the context of the guaranty addendum reflect that its purpose was not to provide the sole "method for ascertaining the guaranty liability" as proposed by IBC. Immediately after the sentence providing that fifty percent of the principal balance is due "at the time of demand," the guaranty addendum states that, "Accordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty," Silvestri's obligations "shall not be reduced by any payment or payments made by any other guarantor(s)." Thus, the purpose of the guaranty addendum was to provide that one guarantor's repayment of his obligations did not discharge the other's obligations. Its purpose was not to provide a "formula" or the sole method for calculating the underlying obligations.

Accordingly, we look to the underlying documents to determine the extent of Silvestri's obligations. *See Carline*, 757 S.W.2d at 113 (providing that guarantor's liability is measured by principal's liability unless "expressly set forth

13

in the guaranty agreement" that guarantor's liability is to be measured otherwise); *First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.2d 917, 924 (Tex. App.—Dallas 2005, no pet.) ("Because a guaranty is ancillary to the underlying contract, a dispute as to the rights and obligations of the guarantor can only be resolved by a factual determination of the rights and obligations of the parties to the underlying contract.").

In its brief, IBC notes that the Silvestri guaranty was executed "[c]oncurrent with the execution of the Real Estate Lien Notes." Separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). Instruments may be construed together even though they are not between the same parties. *Id.*

Here, each real estate lien note incorporates the deeds of trust, stating that,

> Payment hereof is secured by a vendor's lien retained in Deed of even date herewith, to the Borrower, and is additionally secured by a Deed of Trust, Security Agreement, and financing Statement of even date herewith, executed by the borrower and/or Granters thereof . . . .

The addendums to the deeds of trust further provide,

> 4. Fair Market Value for Calculating Deficiencies. Notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantors agree that *Beneficiary shall be entitled to seek a deficiency judgment from Grantors and any other party obligated on the Note or guaranty of the Note equal to the*

> *difference between the amount owing on the Note and fair market value of the Mortgaged Property* as hereinafter determined.

(Emphasis added.) Thus, the addendums to the deeds of trust, not the Silvestri guaranty, provide the specific formula for calculating the underlying liability, i.e., the difference between the amount owing on the notes and the fair market value of the mortgaged properties. And they provide that IBC is entitled to seek this amount from the Grantors and "any other party obligated on the Note or guaranty of the Note."

A review of all of the documents reveals that the intent of the parties was not for IBC to be entitled to foreclose on the properties and then also receive the full value owing on the notes from the guarantors, but instead to be made whole by being entitled to foreclose upon the properties and then receive the remaining portion of the debt not satisfied through foreclosure from the liable parties. Under IBC's interpretation, it would be entitled to recover from Silvestri $2,489,547.34 plus the properties, which had a value of at least $1,694,000, as evidenced by the bids at the foreclosure sale. This would result in a total of $4,183,547.34 out of $4,979,094.68 actually owed on the notes, without even considering the liability of Todd, the second guarantor, from whom the rest of the deficiency is recoverable. This total exceeds the principal indebtedness of $4,068,275.86. Were IBC allowed to recover in this manner from both guarantors, it would receive a windfall by

15

foreclosing on the properties *and* receiving the full amount of the indebtedness from the individual guarantors, which, looking at all of the documents, would circumvent the intent of the parties and go beyond merely making IBC whole.

IBC primarily relies on two cases for the proposition that the addendum to the Silvestri guaranty alone entitles it to recover the full amount due under the real estate lien notes from the guarantors: *Preston Ridge Financial Services Corporation v. Tyler*, 796 S.W.2d 772 (Tex. App.—Dallas 1990, writ denied) and *Humphreys v. Amwest Savings Association*, No. 05-94-00969-CV, 1995 WL 479603 (Tex. App.—Dallas Aug. 8, 1995, no writ) (mem. op.) (not designated for publication). In *Tyler*, the defendant, Tyler, signed a guaranty agreement, personally guaranteeing a portion of the amount due under a promissory note secured by real property. 796 S.W.2d at 774. The guaranty provided that Tyler was to pay "when due" all interest on the note and "that amount of principal indebtedness equal to the amount by with the sum of the outstanding principal balance of the indebtedness . . . exceeds $735,000." *Id.* Tyler argued that because the guaranty agreement provided that he was to pay the guaranteed portion of the indebtedness "upon demand," and the plaintiff had already foreclosed upon the properties before it had made a demand, he was entitled to a credit from the foreclosure proceeds, thereby reducing the guaranteed indebtedness below $735,000. *Id.* at 778. The court held that Tyler's liability was measured by the

16

principal's liability, which became fixed when the principal defaulted on the note before the foreclosure sale. *Id.* at 779. The court specifically noted that the guaranty was only for a portion of the underlying debt and that Preston Ridge would not receive a windfall by applying the foreclosure proceeds to the unguaranteed portion of the debt. *Id.* at 780.

Likewise, in *Humphreys*, the defendant, Humphreys, executed a real estate lien note, secured by a deed of trust, that provided that he was personally liable for "all amounts of principal due at any time in excess of $432,149.00." 1995 WL 479603 at *1. The deed of trust similarly limited Humphreys' personal liability to any amount due in excess of $432,149. *Id.* Humphreys argued that proceeds from a foreclosure sale should be applied first to the portion of the debt on which he agreed to be personally liable. *Id.* at *3. The court concluded that the principal became due at the time of the acceleration, when no foreclosure sale had occurred, so Humphreys was liable for all of the debt in excess of $432,149, without first applying a credit for the foreclosure sale. *Id.* Again, the court noted that only a portion of the debt was guaranteed, so the plaintiff was entitled to apply any foreclosure proceeds to the unguaranteed portion of the debt. *Id.* at *3–4.

Here, unlike in *Preston Ridge* and *Humphreys*, the entire portion of the debt was guaranteed by Silvestri and Todd, so IBC would be entitled to a windfall were it able both to foreclose on the properties and recover the entire indebtedness from

17

both guarantors. And, most importantly, the documents comprising the underlying debt specifically provided a credit for the fair market value of the properties.[2]

## *Evidence of Fair Market Value*

IBC also argues that, even if Silvestri is entitled to a proportional credit for the fair market value of the properties, he failed to satisfy that burden because he "failed to present any competent evidence of the fair market value of the property on the date of foreclosure." Silvestri argues that he presented proper summary-judgment evidence creating a "fact issue sufficient to defeat the Bank's summary judgment."

Silvestri attached Hughey's affidavit to his response to IBC's summary-judgment motion. Relying upon an appraisal from Barletta made two months before the foreclosure sale, Hughey valued the properties at $2,420,000, which he testified was a reasonable value as of April 7, 2009, the date of the foreclosure sale. Hughey also noted that the maximum bid prices at the foreclosure sale, which were attached to IBC's summary-judgment motion, totaled $2,240,000, and IBC had been able to sell 31 vacant lots on the properties at $20,000 per lot.

---

[2] Because we hold that the deeds of trust are controlling and separately provide a credit for the fair market value of the properties, we need not address the parties' arguments concerning the default statutory provisions that provide a credit for proceeds from a foreclosure sale. *See* TEX. PROP. CODE ANN. § 51.003 (Vernon 2007).

Although IBC initially presented the Barletta appraisal as part of its own summary-judgment evidence, it notes that the addendum to the deed of trust provides that the properties "shall be valued in an 'as is' condition as of the date of the foreclosure sale." Thus, IBC now argues that because it took place two months prior to the foreclosure sale, the appraisal is irrelevant and Hughey's reliance on it is conclusory. And IBC now asserts that it presented some evidence of fair market value in the form of its winning bids at the foreclosure sale, which totaled $1,694,000. However, a respondent to a summary-judgment motion is "'not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (quoting TEX. R. CIV. P. 166a(i) cmt. (1997)).

Indulging every reasonable inference in favor of Silvestri and taking his evidence as true, we conclude that he at least presented a material issue of fact regarding the fair market value of the properties, precluding the granting of summary judgment in favor of IBC. Accordingly, we hold that the trial court erred in granting IBC summary judgment and it did not err in denying Silvestri summary judgment.[3] *See Nixon*, 690 S.W.2d at 548–49. We sustain the portion of

---

[3] We note that, in his briefing, Silvestri argues only that he raised a fact issue regarding the fair market value of the property, not that he conclusively proved the fair market value, entitling him to summary judgment. More important, in his own summary-judgment motion, Silvestri argued,

Silvestri's first issue in which he argues that the trial court erred in granting IBC summary judgment. We overrule the portion of Silvestri's first issue in which he argues that the trial court erred in denying him summary judgment.

**Attorney's Fees**

In his second issue, Silvestri argues that the trial court erred in awarding IBC attorney's fees because they are "grossly excessive," he presented evidence that "at very least creates a fact issue concerning the Bank's attorney's fees," IBC's evidence supporting the award of attorney's fees is "conclusory and insufficient," and, under the Silvestri guaranty, only a prevailing party is entitled to recover reasonable and necessary attorney's fees.

The Silvestri guaranty provided for the award of attorney's fees as follows,

In the event any legal action or arbitration proceeding is commenced in connection with the enforcement of any declaration of rights under this Guaranty and/or any instrument or written agreement required or delivered under or pursuant to the terms of this Guaranty or the Guaranteed Indebtedness, and/or any controversy or claim, whether

---

The Addendum clearly places the burden of proving [the fair market value] on [IBC], and *there is no competent evidence of the fair market value of either all or parts of the Mortaged Property or of any difference between the amount owing on the Notes and the fair market value of the Mortgaged Property*."

(Emphasis added.) And Silvestri attached Hughey's affidavit to his response to IBC's summary-judgment motion, in which he prayed only that the trial court deny IBC's motion. Silvestri simply did not ask the trial court to render judgment on the ground that he conclusively proved the fair market value of the properties. Under these circumstances, it is appropriate to conclude that a genuine issue of material fact exists as to the fair market value of the properties and remand to the trial court for resolution. *See Univ. of Tex. Health Sci. Ctr.*, 739 S.W.2d at 792.

20

sounding in contract, tort or statute, legal or equitable, involving in any way the Guaranteed Indebtedness, or any other proposed or actual loan or extension of credit involving Borrower, *the prevailing party* shall be entitled to recover reasonable and necessary attorneys' fees, paralegal costs, expert witness fees and costs, expenses and costs and other necessary disbursements made in connection with any such action or proceeding, in the amount determined by the fact-finder or arbitrator.

(Emphasis added.) A prevailing party is the party "who successfully prosecutes the action or successfully defends against it, prevailing on the main issue." *See Johns v. Ram Forwarding, Inc.*, 29 S.W.3d 635, 637–38 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Thus, the Silvestri Guaranty expressly granted an award of attorney's fees only for the prevailing party. Having held that the trial court erred in granting IBC summary judgment, we further hold that the trial court erred in granting IBC its attorney's fees, both at trial and on appeal. *See Probus Properties v. Kirby*, 200 S.W.3d 258, 265 (Tex. App.—Dallas 2006, pet. denied) (reversing trial court's award of attorney's fees to plaintiff, after holding that trial court erred in not granting defendant judgment notwithstanding the verdict, because plaintiff was no longer "prevailing party" under their contract).

We sustain Silvestri's second issue.

21

## Conclusion

We reverse the judgment of the trial court and remand for proceedings consistent with this opinion.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.